UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

In re:                                              *

MARYLAND PROPERTY ASSOCIATES, INC.,  *
    et al.,
                                                    *

    Debtors.
                                                    *


\*    \*    \*    \*    \*    \*    \*    \*    Bankruptcy No. 00-5578
                                                    Civil Case No. S02-4010
COLOMBOBANK, F.S.B.,                        *
    Appellant,
                                                    *

    v.                                       *

CHARLES R. GOLDSTEIN, TRUSTEE,       *
    Appellee.                               *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*


**Brief of Charles R. Goldstein,
Chapter 7 Trustee and Appellee**


John A. Roberts
Federal Bar No.  04969
Charles M. Campisi
Federal Bar No.  024119
Venable, Baetjer and Howard, LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400

# **TABLE OF CONTENTS**

Page

I.    STATEMENT OF THE ISSUES PRESENTED ........................................ 1

II.   STATEMENT OF THE CASE ...................................................... 2

III.  STATEMENT OF FACTS .......................................................... 4
   A.  Greenbaum's Fraud Scheme ................................................ 5
   B.  The Share Loan Scheme .................................................... 6
   C.  Greenbaum's Personal loans paid with MPA funds ........................ 10
   D.  Payments to Colombo for unexplained purposes ......................... 13

IV.   SUMMARY OF ARGUMENT ...................................................... 15

V.    LEGAL ARGUMENT ............................................................ 17
   A.  Standard of Review ...................................................... 17
   B.  Credibility of witnesses and documentary evidence .................... 17
   C.  Applicable fraudulent conveyance law ................................. 20
       1.  Fraud with intent to hinder, delay or defraud .................... 23
       a. The Bankruptcy Court's finding that Colombo was an active
       participant in the Share Loan scheme is supported by the evidence .... 23
       b. The Share Loan scheme caused damage to MPA ........................ 29
       c. MPA payments made on Greenbaum's personal obligations ............. 30
       d. MPA transfers to Colombo for unexplained purposes ................. 33
       e. Amendments of the pleadings at trial, if necessary ............... 35
       f. Colombo did not "return" any money to MPA ........................ 37
       2.  Conveyances by insolvent entity without consideration ........... 41
       a. There is a presumption of insolvency under the MFCA .............. 41
       b. The Bankruptcy Court affirmatively found insolvency .............. 41
       c. There was no consideration to MPA for the transfers to Colombo .... 43
   D.  Preferences avoidable pursuant to 11 U.S.C. § 547 .................... 46

VI.   CONCLUSION ................................................................ 47

# TABLE OF CASES, STATUTES AND AUTHORITIES

## Cases

*Berger v. Hi-Gear Tire and Auto Supply*, 257 Md. 470, 263 A.2d 507, 510 (1970) ...................................................................................................... 28,32,45

*Colandrea v. Colandrea*, 42 Md. App. 421, 401 A.2d 480, *cert. denied* 286 Md. 745 (1979) ................................................................................................... 32

*Fick v. Perpetual Title*, 115 Md. App. 524, 694 A.2d 138, *cert. denied* 347 Md. 153, 699 A.2d 1168 (1997) .......................................................................... 23,32

*Ford Motor Credit Co. v. Dobbins,* 35 F.2d 860, 865 (4th Cir. 1994) ................ 17

*In re Andreuccetti*, 975 F.2d 413, 419 (7th Cir. 1992) ........................................ 41

*In re Royale Airlines*, 98 F.3d 852, 856 (5th Cir. 1996) ................................... 17,41

*In re Stat-Tech Int'l Corp.*, 47 F.3d 1054, 1057 (10th Cir. 1995) .................. 17,41

*Lacey v. Van Royen*, 259 Md. 80, 267 A.2d 91 (1970) ...................................... 16,41

*Lutherville Supply v. Dimon*, 232 Md. 195, 197-98 (1962) .................................. 45

*Traveler's Ins. Co. v. Bryson Prop. XVIII (In re Bryson Prop. XVIII),* 961 F.2d 496, 499 (4th Cir.), *cert. denied*, 506 U.S. 866 (1992) ...................................... 17

*Watson v. Watson*, 73 Md. App. 483, 534 A.2d 1365 (1988) ........................... 28,32

## Statutes

Md. Com. Law II Code Ann. § 15-203 ................................................................ 44

Md. Com. Law II Code Ann. § 15-204 .............................................................. 22,41

Md. Com. Law II Code Ann. § 15-207 ................................................................ 21

Md. Cts. & Jud. Proc. Code Ann. § 5-101 .......................................................... 22

11 U.S.C. § 544(b) ........................................................................... 3,4,20,21,22

11 U.S.C. § 547 ................................................................................... 3,4,46,47

11 U.S.C. § 548 ............................................................................... 3,4,20,21,22

11 U.S.C. § 550 ..................................................................................... 3,4

11 U.S.C. § 704 ........................................................................................ 43

Fed. R. Civ. P. 15(b) .............................................................................. 1, 36

Maryland Uniform Fraudulent Conveyance Act, Md. Com. Law II Code Ann. §§ 15-201 ....................................................................................... 3,4,22,35

## I.  STATEMENT OF THE ISSUES PRESENTED

1.     Whether the Bankruptcy Court correctly entered judgment in favor of the Chapter 7 Trustee avoiding $444,523.99 in fraudulent transfers to Colombo Bank after finding, based upon testimony and documentary evidence, that the transfers were made either: (i) as part of a fraudulent scheme in which Colombo Bank participated by concealing financial information from auditors and preparing "dummied up" account statements that defrauded creditors of Maryland Property Associates, Inc. or (ii) in payment of obligations not owed by Maryland Property Associates, Inc., thus making them transfers by an insolvent entity with no consideration.

2.     Whether the Bankruptcy Court correctly refused to find that Colombo Bank "repaid" money fraudulently transferred to it by later transferring its customers' money held in Colombo accounts.

3.     To the extent an amendment of the complaint was necessary, whether the Court correctly allowed the Trustee to amend his damages claim to conform to the evidence presented at trial under Fed. R. Civ. P. 15(b).

4.     Whether the Court correctly allowed the Trustee to testify as an expert in the area of insolvency when he was disclosed as an expert pursuant to the Court's scheduling order and testified to rebut evidence presented by the defendant.

## II.  <u>STATEMENT OF THE CASE</u>

This case is an action by Charles R. Goldstein, the Chapter 7 Trustee (the "Trustee") for Maryland Property Associates, Inc. (the "Debtor" or "MPA") to avoid and recover fraudulent conveyances and preferential transfers made by MPA to ColomboBank, FSB ("Colombo").  MPA was a property management company that managed housing projects subsidized by the Department of Housing and Urban Development ("HUD").  Monte Greenbaum ("Greenbaum"), the former president of MPA, illegally used funds belonging to MPA and the properties it managed for his own benefit. Greenbaum was indicted, convicted and served time in a federal penitentiary for his actions.

The transfers sought to be recovered fall into four categories: (i) transfers made in payment of a "Share Loan" scheme, in which Colombo actively participated, that had the effect of concealing from HUD and MPA's creditors the fact that funds belonging to the properties had been converted ($276,180.18), (ii) transfers made by MPA to Colombo in payment of a personal loan to Greenbaum secured by Greenbaum's Ocean City, Maryland condominium ($19,394.33), (iii) transfers made by MPA to Colombo in payment of a personal loan to Greenbaum secured by Greenbaum's Columbia, Maryland residence ($20,220.32) and (iv) transfers made by MPA to Colombo

for which Colombo was unable to provide an explanation ($128,729.06). The
total recovery sought by the Trustee was $444,523.89.

The Trustee sought to avoid the transfers on three bases: the
transfers were (i) fraudulent conveyances made with the actual intent to
hinder, delay or defraud creditors of MPA, pursuant to § 548 of Title 11 of the
United States Code (the "Bankruptcy Code"), and pursuant to the Maryland
Uniform Fraudulent Conveyance Act, Md. Com. Law II Code Ann. §§ 15-201,
*et seq.* (the "MFCA"), made applicable by 11 U.S.C. § 544(b), (ii) fraudulent
conveyances made by MPA, an insolvent entity, for which MPA did not receive
adequate or fair consideration, pursuant to 11 U.S.C. § 548 and the MFCA,
and (iii) preferential transfers that allowed Colombo to receive more than
other similarly situated creditors pursuant to 11 U.S.C. § 547. The Trustee is
entitled to recover such fraudulent conveyances and preferential transfers
from the transferee pursuant to 11 U.S.C. § 550.

A three-day trial was held before the Bankruptcy Court. Based
upon the documentary and testimonial evidence presented at trial, the
Bankruptcy Court found:

> 1. Colombo participated in the fraud scheme that
> hindered, delayed and defrauded creditors;
>
> 2. The transfers were from property of the
> bankruptcy estate;
>
> 3. MPA was insolvent at all relevant times; and

    4.  The obligations for which payments were made
    by MPA to Colombo were not MPA's obligations.

After making such factual findings, the Bankruptcy Court applied the MFCA

and 11 U.S.C. §§ 544, 547, 548 and 550 and entered an order and judgment in

favor of the Trustee and against Colombo for $444,523.89.

        Colombo appeals from that order.


## III.  <u>STATEMENT OF FACTS</u>

        An involuntary petition under Chapter 7 of Title 11 of the

Bankruptcy Code was filed on March 17, 1998 against Maryland Property

Associates, Inc. ("MPA" or the "Debtor").  Op., p. 2.[1]  On March 24, 1998, an

order for relief was entered by the Bankruptcy Court upon the Debtor's

consent.  *Id.*  The following day, Charles R. Goldstein ("Goldstein" or the

"Trustee") was appointed Chapter 7 Trustee.  *Id.*  On April 24, 1998, the

Trustee filed involuntary petitions for relief under Chapter 7 of the

Bankruptcy Code against MPA's affiliates, Maryland Property Management,

Inc., Maryland Property Group, Inc., Maryland Group Management, Inc.,

Maryland Property Systems, Inc., and Maryland Property Services, Inc.  *Id.*

        The collapse of MPA was due to a fraud scheme perpetuated by

Monte Greenbaum, the former owner and president of the Debtor.  Tr., pp. 65,

---

[1] Citations to the Bankruptcy Court's Memorandum Opinion are denoted as "Op., p. _."  Citations to the trial transcript are denoted as "Tr., p. _."  Citations to trial exhibits are denoted as "P. _, [description]" indicating Plaintiff, Trustee, Trial Ex. number _. or "D._ [description]" indicating Defendant, Colombo, Trial Ex. number _.

81.  MPA was a property management company that managed housing projects that were owned by various partnerships (the "Properties") and were subsidized by HUD.  Tr., pp. 45-46.  MPA managed the Properties, collected rents on behalf of the Properties and paid their expenses.  Tr., pp. 51-52.  For this service, MPA was entitled to be paid a management fee by the Properties.  P.7, Plea Agreement, p. 3.  As part of its management operation, MPA and Greenbaum had control over the Properties' funds.  Tr., pp. 51-54.

MPA maintained two principal bank accounts.  Tr., pp. 52-54.  One account contained funds of MPA, earned as part of its management fee and used to pay MPA's own expenses (the "Operating Account").  Tr., pp. 53-54.  The second account was an account where MPA held funds as an agent for the Properties that it managed (the "Agency Account").  Tr., pp. 52-53.

### A.  Greenbaum's Fraud Scheme

Greenbaum's fraud scheme was to use the funds of MPA and the Properties to pay his own personal bills, essentially using company checks to pay personal expenses.  Tr., pp. 54-55; P. 7, Plea Agreement, pp. 4-5.  MPA received no consideration for these transfers, while Greenbaum benefited by having his bills paid with company funds.  Tr., p. 55.  Greenbaum did not repay MPA for these transfers.  Tr., p. 82.

The sheer amount of these transfers caused a cash shortfall for MPA so that it could not pay its creditors for legitimate expenses as those payments came due.  Tr., pp. 65, 81.  The undisputed evidence supported the

Court's finding that MPA was insolvent at all times relevant to the case. Tr., pp. 65, 81.

### B. The Share Loan Scheme

As part of his fraud, Greenbaum raided the Properties' tenant escrow accounts, which were accounts in which the tenants' security deposits were held in escrow. P. 7, Plea Agreement, p. 4-5. In order to conceal from the Properties and HUD that he had converted the escrow accounts to his own use, Greenbaum began what became known as the "Share Loan" scheme. Tr., pp. 115-19; P. 7, Plea Agreement, pp.4-5.

Greenbaum had previously been a director of Colombo. Op., p. 12; Tr., p. 236. Greenbaum approached Colombo, where he still had connections, and arranged for Colombo to make loans to the Properties, with the loan proceeds to be used to secure the loans themselves. Op., p. 12; Tr., pp. 115-59, 236-38. Greenbaum met with Thomas Knowles, then president of Colombo ("Knowles"), regarding the loans. Tr., pp. 116-19, 137, 237-40. Knowles also told Joel Fernebok ("Fernebok"), who was Greenbaum's friend and chairman of Colombo, about the loans. Tr., p. 239. As Chairman of the Bank, Fernebok was Knowles' boss. *Id.*

Knowles asked Greenbaum what the loans were for and Greenbaum told him he needed to "establish a reserve." Tr., p. 137. Knowles then pointed out that the accounts would be encumbered by the loans, but did no further investigation. Tr., p. 137.

Knowles testified that the request for loans that were to be secured by the loan proceeds themselves was out of the ordinary.  Tr., p. 245. He further testified that he had never made a loan like that before, nor had he since.  Tr., p. 245.  When Colombo was eventually audited, the auditors also remarked to Knowles that the loans were very unusual.  Tr., p. 258.

Greenbaum fraudulently borrowed the funds in the names of Freedom Associates, Uplands A and Uplands B, the owners of the Properties whose escrow accounts he needed to replace.  P. 7, Plea agreement, p. 5; Tr., pp. 240, 285-86.  Colombo placed the proceeds in bank accounts in the names of the owners of the Properties, so that Greenbaum could show HUD these fictitious escrow accounts.  P. 7, Plea agreement, p. 5; Tr., pp. 240-41.

Colombo took several affirmative actions to aid Greenbaum in his fraud scheme.  The president of Colombo, Knowles, signed at least two account confirmation forms that were to be sent to MPA's auditors, confirming the balances in the Properties' fictitious escrow accounts but concealing from the auditors and from the Properties that the accounts were fully encumbered by the loans that funded them.  Tr., pp. 246-47, 250-56; P. 18, Account Confirmation Forms, Bates Nos. L026926 and L029412.

The confirmation form stated that: (i) it was to be mailed directly to MPA's accountants and (ii) the signor was to indicate whether there were outstanding loan balances.  P. 18, Account Confirmation Forms, Bates Nos. L026926 and L029412.  Colombo, through its president, ignored the

instructions on the form and concealed the loans that fully encumbered the bank accounts. Tr., pp. 246-47, 250-56; P. 18, Account Confirmation Forms, Bates Nos. L026926 and L029412. This action was unusual in the first place, Knowles admitted, because Greenbaum brought the form to Knowles, even though the form should have been sent to Colombo by the auditors. Tr., p. 247. Knowles returned the form directly to Greenbaum, again breaking convention and in violation of the instructions printed on the form. Tr., pp. 256-57.

Greenbaum also called Knowles at Colombo regarding the interest accruing in the reserve accounts. Tr., pp. 243-44. Greenbaum told Knowles that the accounts were not to show interest. Tr., pp. 241-43. Colombo again took affirmative action to assist Greenbaum in his scheme. Tr., pp. 243-44. Colombo manually created dummy account statements that concealed that the escrow accounts were bearing interest. *Id.* Instead of sending to MPA the interest statements generated by Colombo's computer system, Knowles took blank account forms and used a word processor to type in false interest information, concealing the nature of the accounts. *Id.*

The Share Loan scheme continued for several years, concealing Greenbaum's fraud from HUD and MPA's auditors and allowing the siphoning of funds from MPA and from the tenant escrow accounts to go undetected and grow. Op., p. 12; P. 7, Plea Agreement, pp. 4-5. Knowles was eventually sued by Colombo for his role in the Share Loan scheme. Tr., pp. 300-03.

During the three years prior to MPA's bankruptcy filing, MPA made four payments to Colombo in furtherance of the Share Loan scheme.

***Payments On Share Loans:***

| Check No. | Date | Amount |
|---|---|---|
| 1116 | September 17, 1996 | $24,406.41 |
| 1315 | May 7, 1997 | $9,076.01 |
| 1359 | July 14, 1997 | $238,751.61 |
| 1374 | August 12, 1997 | $3,946.15 |
| ***Total*** | | ***$276,180.18*** |

P. 1, Checks; P. 2, Checks and payment information.  The Share Loan scheme substantially ended in July of 1997.  P. 1, Checks; P. 2, Checks and payment information; P. 10, Loan Statements.  MPA used $238,751.61 from its own Operating Account to pay off the loans taken out by Greenbaum in the names of Freedom Associates, Uplands A and Uplands B.  Tr., p. 214; P. 1, Checks; P. 2, Checks and payment information; P. 10, Loan Statements.  The source of the funds that MPA used to make the $238,751.61 payment was MPA's Operating Account, which had received money wired from a bank in Florida to MPA just prior to the payment to Colombo.  Tr., p. 214.  Colombo incorrectly asserts in its brief that these funds came from the managed Properties, completely ignoring the findings of the Bankruptcy Court and evidence to the contrary.  Colombo's Brief at p.10.  Colombo was paid with funds that were commingled in MPA's Operating Account.  Tr., p. 214; Op., pp. 6-11.  The Bankruptcy Court found that the $238,751.61 payment was made with funds that were property of MPA.  Op., pp. 6-11.

The Share Loan scheme worked.  Greenbaum and Colombo successfully concealed from HUD and MPA's auditors for years the fact that Greenbaum had been raiding MPA and the tenant escrow accounts of the Properties it managed.  P. 7, Plea Agreement, pp. 4-5.

After the Share Loans were paid off, the escrow accounts remained at Colombo in the names of Freedom Associates, Uplands A and Uplands B for four to five months.  Tr., pp. 308-12, 329.  During this time the escrow accounts were unencumbered and the funds could have been withdrawn at any time by Freedom Associates, Uplands A or Uplands B.  *Id.* The escrow accounts were eventually closed and the funds in them were wired to MPA's Agency Account in October and November of 1997.  *Id.*

The funds that were wired to the MPA Agency Account did not belong to Colombo, as they were merely deposits held by Colombo in accounts belonging to Freedom Associates, Uplands A and Uplands B.  Tr., pp. 308-12, 329.  Colombo's witness, John Lane ("Lane"), who was president of Colombo at the time of the trial, admitted that the funds in those accounts belonged to the Properties in whose name the accounts were established.  Tr., p. 334.  Colombo thus did not "repay" MPA for the fraudulent conveyance on July 12, 1997 of $238,751.61, as argued in Colombo's brief.

## C.  Greenbaum's Personal Loans Paid with MPA Funds

Greenbaum skimmed money from MPA and paid his personal obligations with corporate funds.  P. 7, Plea Agreement, pp. 4-5.  Among the

personal debts paid illegally with corporate funds were Greenbaum's alimony,
pool service at his personal residence and jewelry.  P. 7, Plea Agreement, pp. 4-
5; Tr., p. 55.

Greenbaum also used MPA funds to pay two personal loan
obligations to Colombo, including a deed of trust loan on his personal
residence in Columbia, Maryland and a loan for his condo in Ocean City,
Maryland.  P. 1, Checks; P. 2, Checks and payment information.  Although
Greenbaum testified that the proceeds of the Columbia residence loan were
loaned to MPA, his testimony is contradicted by the documentary evidence
that indicated it was a personal loan.  Tr., pp. 261-62; P. 29, Loan Request
Memo.  There was no evidence that the Ocean City Condo loan was anything
but a personal obligation of Greenbaum.  P. 2; Checks and payment
information.

Colombo accepted MPA company checks and applied MPA funds
to Greenbaum's loan obligations despite the fact that the bank's own records
showed that they were personal obligations of Greenbaum.  P. 1, Checks; P. 2,
Checks and payment information.  According to Colombo's records, the loans
were in Greenbaum's name personally and the application for the Columbia
mortgage indicated the funds were for personal use.  P. 2; Checks and payment
information; P. 29, Loan Request Memo.  (Colombo did not produce the loan
documents for the Ocean City condo.)  MPA received no consideration for these
payments because the benefit of the payments was for Greenbaum, who was

the sole obligor of the loans,.  P. 2; Checks and payment information; P. 7, Plea

Agreement; P. 29, Loan Request Memo.  Colombo concedes that Greenbaum

was improperly using corporate funds to pay his personal expenses.  Colombo's

Brief, pp. 5, 6.

The payments made by MPA on the Columbia residence loan and

Ocean City condo loan were as follows[2]:

**Greenbaum Columbia deed of trust 2-24-149**

| Check No. | Date | Amount |
|---|---|---|
| 23521 | October 3, 1996 | $720.28 |
| 1176 | December 4, 1996 | $853.26 |
| 1274 | March 11, 1997 | $4,253.56 |
| 1315 | May 7, 1997 | $1,168.06* |
| 1333 | June 6, 1997 | $2,361.49** |
| 26468 | August 8, 1997 | $1,305.10 |
| 26702 | September 5, 1997 | $1,200.10 |
| 26918 | October 3, 1997 | $2,361.01** |
| 27162 | November 5, 1997 | $1,199.92** |
| 27452 | December 5, 1997 | $1,199.92** |
| 27678 | January 7, 1998 | $1,199.92 |
| 27925 | February 6, 1998 | $1,198.85 |
| 104 | March 11, 1998 | $1,198.85 |
| **Total** | | **$20,220.32** |

---

[2] A letter from Colombo attached to check number 1315, in the amount of $11,395.64, indicates this check, designated with *, was in payment of 9 separate loans, including share loans, the condo loan and the Columbia home loan.

 Paperwork attached to check numbers 1333, 26918, 27162 and 27452, designated with **, in the respective amounts of $4,630.39, $8,773.12, $7,612.03 and $7,612.03, indicates that portions of each check were in payment of the OC mortgage and Columbia home loan.

***Ocean City Condo loan 2-4-10***

| Check No. | Date | Amount |
|---|---|---|
| 1185 | December 10, 1996 | $4,000.00 |
| 1240 | January 27, 1997 | $2,800.00 |
| 1306 | April 25, 1997 | $2,304.94 |
| 1315 | May 7, 1997 | $1,151.57* |
| 1333 | June 6, 1997 | $2,268.90** |
| 26106 | July 3, 1997 | $1,185.29 |
| 26497 | August 8, 1997 | $1,222.47 |
| 26701 | September 5, 1997 | $1,115.29 |
| 26918 | October 3, 1997 | $1,115.29** |
| 27162 | November 5, 1997 | $1,115.29** |
| 27452 | December 5, 1997 | $1,115.29** |
| **Total** | | ***$19,394.33*** |

P. 1, Checks; P. 2, Checks and payment information.

### D.  Payments to Colombo for Unexplained Purposes

MPA also made two transfers to Colombo for which Colombo was able to offer no explanation as to what obligations the transfers paid.  Op., pp. 4-5.  On May 22, 1995, MPA transferred $172,000 to Colombo by check number 784.  P. 1, Checks; P. 2, Checks and payment information.  Colombo was able to produce documents demonstrating that a $52,963.88 portion of check number 784 was in payment of a loan to Mr. Morton Sarubin ("Sarubin" and the "Sarubin Loan").  The Sarubin Loan was guarantied by MPA.  D. 35, Guaranty.

In the Complaint, the Trustee identified the $172,000 transfer and asserted that $72,000 was for the benefit of Greenbaum.  Docket No. 1, Complaint, ¶ 7.  The Trustee sought to avoid the transfer evidenced by this

check.  Docket No. 1, Complaint, Count I.  Prior to discovery and trial, the

portion applied to the Sarubin Loan appeared to be $100,000.  *Id.*  However,

Colombo presented testimony by its president (at the time of the trial), Lane,

regarding this transaction.  Tr., pp. 322-23 (examination by Colombo), 334-36

(examination by the Trustee).  Lane testified that only $52,963.88 was applied

to the Sarubin Loan and the remainder of the $172,000 was applied to the

Share Loans.  *Id.*  Documentary evidence produced by Colombo, however,

conflicted with Lane's testimony and only explained the $52,963.88 applied to

the Sarubin Loan.  D. 22, Loan Statement (identified, but not admitted).

There was no documentary evidence regarding the remaining $119,036.12 of

the $172,000.00 transfer.  Tr., pp. 322-23 (examination by Colombo), 334-36

(examination by the Trustee).  Lane initially testified that he had investigated

the payment and could explain how it was applied by Colombo, but when asked

to do so on the stand, conceded he could not.  *Id.*  Judge Schneider did not

believe Lane, instead choosing to believe the documentary evidence presented

by the Trustee.  Further, because Colombo submitted no documentary

evidence to support its defense, the Court could and did apply a negative

inference to Lane's testimony.  Op., p. 4.  The Bankruptcy Court determined

that the balance of the $172,000 payment, $119,036.12, was left unexplained.

Op., pp. 4-5.

There was also a payment of $9,692.94 on February 19, 1997 for

which Colombo offered no explanation of how it was applied.  P. 2, Checks and

payment information.  Because Colombo could offer no believable explanation

to overcome the Trustee's evidence that the transfers were fraudulent, the

Bankruptcy Court found that the transfers could be avoided by the Trustee.

**Unexplained payments:**

| Check No. | Date | Amount |
|---|---|---|
| 784 | May 22, 1995 | $119,036.12 |
| 1254 | February 19, 1997 | $9,692.94 |
| *Total* | | *$128,729.06* |

P. 1, Checks; P. 2, Checks and payment information;   Tr., pp. 322-23, 334-36.

The four categories of damages are totaled as follows:

| | Damages Category | Amount of Damages |
|---|---|---|
| *1.* | Share loans | $276,180.18 |
| *2.* | Payments on Ocean City condo 2-4-10 | $19,394.33 |
| *3.* | Payments on Columbia mortgage 2-24-149 | $20,220.32 |
| *4.* | Unexplained | $128,729.06 |
| *Total* | | *$444,523.89* |

## IV.    SUMMARY OF ARGUMENT

Colombo, a federally regulated banking institution, participated

in Greenbaum's fraud scheme in multiple ways: (i) it made unconventional

loans requested by a former director of the Bank without conducting a

reasonable inquiry of the borrower, (ii) it concealed the existence of those loans

from auditors and (iii) it falsified records to conceal the nature of depository

accounts funded by those loans.  Greenbaum and Knowles confessed to the

fraud scheme, supporting the Bankruptcy Court's finding of actual fraud and Colombo's role in it.  The fraud scheme had the effect of allowing Greenbaum to continue defrauding MPA and its managed Properties, thereby increasing MPA's liabilities and depleting its assets, damaging the estate.  Furthermore, it allowed certain transactions to slip beyond the applicable statutes of limitations, putting them out of reach of the Trustee.

Colombo's principal defense is that it "returned" a portion of the fraudulent conveyances when it transferred funds from the tenant escrow accounts to MPA.  This argument is baseless.  The monies "returned" by Colombo did not belong to Colombo.  That money belonged to the managed Properties in whose accounts the Share Loans were held.  This fact was admitted by Colombo's president at trial.  Colombo was a participant in a fraud scheme that caused damage to MPA and its creditors and is not entitled to any credit.

In addition to Colombo's participation in intentional fraud, the Trustee also met the burden of proving that the transfers were avoidable because they were conveyances by an insolvent entity for no consideration.  It was Colombo's burden to prove solvency, which it did not do.  *Lacey v. Van Royen*, 259 Md. 80, 267 A.2d 91 (1970).  The Bankruptcy Court made an affirmative finding that MPA was insolvent at all relevant times.  This finding was supported by the Trustee's testimony as a fact witness who had

investigated MPA as part of his duties as Trustee, as well as his expert

testimony, none of which was rebutted by Colombo.

　　　　　The Trustee met his burden of showing that there was no

consideration given by Colombo for the transfers.  Colombo admitted that a

number of payments were in furtherance of a fraud scheme, others went

unexplained and still others paid personal obligations of Greenbaum.  These

payments did not benefit MPA and are thereby avoidable as fraudulent

conveyances by an insolvent for no inadequate consideration.

## V.　　LEGAL ARGUMENT

### A.  Standard of Review

　　　　　On appeal, the Bankruptcy Court's factual findings are not to be

set aside unless clearly erroneous.  *Traveler's Ins. Co. v. Bryson Prop. XVIII (In*

*re Bryson Prop. XVIII),* 961 F.2d 496, 499 (4th Cir.), *cert. denied*, 506 U.S. 866

(1992).  The Bankruptcy Court's conclusions of law are reviewed *de novo*.

*Bryson Prop. XVIII*, 961 F.2d at 499; Fed. R. Bankr. P. 8013.

　　　　　The District Court may affirm the Bankruptcy Court's decision

on any other grounds supported by the record.  *In re Royale Airlines*, 98 F.3d

852, 856 (5th Cir. 1996); *In re Stat-Tech Int'l Corp.*, 47 F.3d 1054, 1057 (10th

Cir. 1995); *In re Andreuccetti*, 975 F.2d 413, 419 (7th Cir. 1992).

### B.　 Credibility of witnesses and documentary evidence

　　　　　The Bankruptcy Court was in the best position to evaluate the

credibility of witnesses in this case.  *Ford Motor Credit v. Dobbins*, 35 F.2d 860,

865 (4th Cir. 1994).  The parties presented documentary evidence and the testimony of four witnesses.

### Charles R. Goldstein, Chapter 7 Trustee

Mr. Goldstein's testimony was found to be credible by Judge Schneider.  Mr. Goldstein was allowed by the Court to testify as an expert and his qualifications were unchallenged by Colombo.  The Bankruptcy Court relied on Mr. Goldstein on the issue of insolvency.  Op., p. 5.  Perhaps the best indication that Judge Schneider found Mr. Goldstein credible is that he granted relief to the Trustee in the full amount sought at trial.  Op., p. 12-13.

### Monte Greenbaum

Mr. Greenbaum is a convicted felon and as such any of his testimony that contradicts credible evidence is entitled to little weight.  He was convicted of engaging in a fraudulent scheme and was summoned from prison to testify at the trial of this case.  His fraudulent scheme was the cause of MPA's insolvency.  The only area where his testimony is credible is in confirming the facts surrounding his fraud scheme as they are outlined in his plea agreement.  P. 7, Plea Agreement.  The plea agreement represents the results of the investigation of the Department of Justice, is executed by the United States Attorney and is credible.

### Thomas Knowles

Mr. Knowles admitted on the stand his role in the Share Loan scheme.  He admitted making unconventional loans, signing false account

confirmations and creating dummy account statements. Knowles admitted to participating in the Share Loan scheme at the time he was the President of Colombo. He was later sued by Colombo for these actions. The Bankruptcy Court believed the former bank president's testimony regarding his own participation in the fraudulent scheme.

### John Lane

Mr. Lane was not a credible witness. His testimony conflicted with the documentary evidence when he claimed that certain documents existed (MPA guaranty of the Share Loans, documents explaining how the May 22, 1995 check was applied), when plainly they did not. Judge Schneider did not find him credible and applied a negative inference to his testimony.

### Documentary Evidence

The documentary evidence largely stands by itself. The key documents in this case were the 24 checks at issue (P. 1), the documents showing how those checks were applied by Colombo (P. 2), the plea agreement of Monte Greenbaum that described the fraud (P. 7), the false account confirmations (P. 18, Bates numbers L026926 and L029412) and the statement of Greenbaum's disbursements in excess of claimed income (P. 38). These documents were unrefuted by any credible witness.

In sum, the Trustee presented his case and relied on the documents and the facts discovered by his investigation. At trial, Greenbaum and Knowles, a former president of Colombo, both testified regarding the fraud

scheme.  Also at trial, Lane, then president of Colombo, gave unbelievable

testimony that conflicted with the documentary evidence and was rejected by

the Judge.  It is clear from the Bankruptcy Court's opinion and judgment that

Judge Schneider believed the Trustee, relied on the documents and gave no

credence to Colombo's case.  Colombo now appeals that decision and urges this

Court to find that the trial judge was clearly erroneous.  Colombo relies on the

testimony of two of its presidents -- Knowles, who admitted to participating in a

fraud scheme and Lane, whose testimony contradicted the documents and was

not believed by the Judge.  Colombo also asks this Court to find the testimony

of a convicted felon and fraudster, Greenbaum, believable.  This Court should

uphold the findings of the trial Judge based on credibility and affirm the

decision.

### C.  Applicable fraudulent conveyance law

As pled in Counts I and II of the Complaint, the Trustee is

entitled to avoid and recover fraudulent transfers under the Bankruptcy Code

pursuant to § 548 and also under Maryland fraudulent conveyance law

pursuant to § 544(b)(1).

According to § 548 of the Bankruptcy Code:

> The Trustee may avoid any transfer of an interest of
> the debtor in property, or any obligation incurred by the
> debtor, that was made or incurred on or within one year
> before the date of filing of the petition, if the debtor
> voluntarily or involuntarily-

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

Simply stated, § 548 allows the Trustee to avoid transfers made within one year prior to the filing of the Debtor's bankruptcy petition if: (i) the transfer was made with actual fraudulent intent *or* (ii) the transfer was made by an insolvent debtor that did not receive adequate consideration.

The Bankruptcy Code also allows the Trustee to avoid fraudulent transfers under state law pursuant to § 544. Section 544(b)(1) of the Bankruptcy Code provides in pertinent part that:

[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim.

11 U.S.C. § 544(b)(1). Thus, § 544(b) allows the Trustee to avoid fraudulent transfers under state law. The law applicable to this case is the Maryland Uniform Fraudulent Conveyance Act codified at Md. Comm. Code Ann., §15-201 *et. seq.* (the "MFCA"). Section 15-207 of the MFCA provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud

> present or future creditors, is fraudulent as to both
> present and future creditors.

Section 15-204 of the MFCA provides:

> Every conveyance made and every obligation
> incurred by a person who is or will be rendered
> insolvent by it is fraudulent as to creditors without
> regard to his actual intent, if the conveyance is
> made or the obligation is incurred without fair
> consideration.

Like § 548, and pursuant to §§ 15-207 and 15-204 respectively, the MFCA allows the Trustee to avoid: (i) transfers made with actual fraudulent intent *or* (ii) transfers made by an insolvent debtor that does not receive fair consideration for the transfer. The principal difference between avoiding a transfer under § 544(b)(1) and the MFCA and avoiding a transfer under § 548 is that the Trustee may avoid transfers made up to three years prior to the Debtor's bankruptcy petition using the MFCA, as opposed to one year under § 548. Md. Cts. & Jud. Proc. Code Ann. § 5-101.

The Bankruptcy Court determined that Colombo received from MPA transfers that were made with actual fraudulent intent, as well as transfers by an insolvent entity for no consideration. The Court allowed the Trustee to avoid and recover transfers made up to three years prior to the Debtor's bankruptcy petition by applying the MFCA through § 544(b)(1), as well as § 548.

### 1. Fraud with intent to hinder, delay or defraud

The transfers to Colombo were made with the intent to hinder, delay or defraud MPA's creditors. Colombo admits that Greenbaum perpetrated a fraudulent scheme. Colombo's Brief at pp. 13, 15, 16. Greenbaum admitted in testimony before the Bankruptcy Court and in his Plea Agreement that his fraud included the Share Loan scheme. Tr., pp. 10-19, 131-43; P. 7, Plea Agreement. To prove that Colombo had the requisite fraudulent intent, the Trustee must show that Colombo merely knew of circumstances that would put a reasonable person on inquiry that the transferor was committing fraud. *Fick v. Perpetual Title*, 115 Md. App. 524, 540, 694 A.2d 138, *cert. denied* 347 Md. 153, 699 A.2d 1168 (1997). The Bankruptcy Court found that Colombo knew or should have known of the fraudulent scheme while it actively participated in and facilitated Greenbaum's fraud. Op., p. 12-13.

### a. The Bankruptcy Court's finding that Colombo was an active participant in the Share Loan scheme is supported by the evidence.

Colombo has admitted that it participated in the Share Loan scheme by: (i) deviating from ordinary banking practice and making loans that were secured by the loan proceeds themselves, (ii) concealing from MPA's auditors that the tenant escrow accounts were fully encumbered by loans and (iii) fabricating dummy account statements to conceal the nature of the deposit accounts. Op., pp. 11-13; Tr., pp. 236-38, 245-47, 250-56; P. 18, Account

Confirmation Forms, Bates Nos. L026926 and L029412.  These actions,

***committed by the Bank's president,*** support the Bankruptcy Court's

conclusion that Colombo knew or should have known that it was involved in a

fraud.  Op., p. 13.  Colombo confirmed that the actions of Knowles, its former

president, were improper when it sued Knowles for negligence.  Tr., pp. 300-03.

Knowles testified that he knew the loans were out of the ordinary.

Tr., pp. 244-45.  At the time the loans were made, Colombo knew or should

have known that Greenbaum was involved in a fraud.  Greenbaum testified

under examination by counsel for Colombo:

> Q.     Go through it for me briefly.  How did it work
> and how did you do it?
>
> A.     I contacted Tom Knowles at the bank because
> we were using Colombo Savings Bank anyway, and
> I told him I would like to -- I would like to make a
> loan from the bank.  But when I make the loan, I
> would like to also have the cash that's on deposit as
> the security for the loan.  And he said -- I mean, he's
> going to be in here, but you can ask him, his
> comment, and hopefully he'll remember exactly was,
> "That's a wonderful loan for our bank.  We love
> loans like that.  Why do you want to do that?"
>
> And my comment was, "I have to establish
> some reserve.  I need to establish a reserve."  And he
> said, "Yeah, but you're borrowing money."  And I
> said, "Well, I can establish the reserves that way."
> That's what I said to him.  "I can establish the
> reserves that way."  And that ended it.  There was
> no more questioning at that time.

Tr., p. 137.  Knowles was on notice that he was making unconventional loans

and even asked Greenbaum why he would want to make such an

unconventional loan.  But when given an answer that did not make sense --
that the deposits would "establish a reserve" notwithstanding that the money
was borrowed -- Knowles did nothing to investigate further and went ahead
and made the loans.

Colombo's participation in the fraud did not end there.  Knowles
signed at least two fraudulent account confirmations.  P. 18, Account
Confirmation Forms, Bates Nos. L026926 and L029412.  The account
confirmation form signed by Knowles as president of Colombo is a standard
form approved by the American Bankers Association.  *Id.*  The form instructs
the bank to confirm the existence of deposits and loans related to the customer
and ***mail the form directly to the customer's accountants***.  *Id.*  Knowles
testified that the audit firm, not Greenbaum, should have sent the forms to
him because the person being audited should not bring the form to the bank.
Tr., p. 247.  Knowles testified that he signed the false confirmations and
handed them back to Greenbaum, ignoring the instructions printed on the
form.  Tr., pp. 256-57.

The account confirmations signed by Knowles confirm the
existence of deposit balances for Uplands Associates A, L.P. and Uplands
Associates B, L.P. in the amounts of $94,500.00 and $76,500.00, respectively.
P. 18, Account Confirmation Forms, Bates Nos. L026926 and L029412.
Knowles, however, left blank the spaces where loans should have been
disclosed.  *Id.*  Knowles' signature is just below the following affirmation:

> The information presented above by the customer is
> in agreement with our records.  Although we have
> not conducted a comprehensive, detailed search of
> our records, no other deposit or loan accounts have
> come to our attention except as noted below.

P. 18, pp. L026926 and L029412.  Knowles signed the confirmations even

though he knew them to be false.  Tr., pp. 246-47.[3]  He was the loan officer that

made the original unconventional loans and, by signing the confirmations

that concealed the existence of the encumbering loans, Knowles assisted

Greenbaum in his fraud.  Op., pp. 12-13.  Knowles testified

that to fill out the confirmation forms accurately, he should have filled in the

spaces to disclose the existence of the Share Loans.  Tr., pp. 251-52.  When

Greenbaum presented Knowles with the confirmation that Knowles knew to be

false, he should have refused to sign it.  As an officer of the bank, indeed, its

president, Knowles should have known to not involve the bank in a fraud.

Instead, Knowles drew Colombo deeper into the fraud by compounding his

initial misdeed of making the fraudulent loans by concealing their existence

from MPA's auditors and assisting Greenbaum in his fraud.

Colombo's involvement in the fraud scheme continued.

Greenbaum contacted Knowles about the fact that the monthly statements for

the deposit accounts showed that they were earning interest.  Tr., pp. 241-43.

Greenbaum told Knowles that the accounts were not to show interest.  *Id.*

---

[3] Contrary to the assertion in Appellant's brief, Knowles never testified that he would not have signed the
forms had he understood them.  Appellant's Brief at 7.

Account statements that showed accrued interest would have allowed the

accountants to determine how long the deposit accounts had been open and

could have alerted them to Greenbaum's scheme. Knowles further assisted

Greenbaum in the fraud by concealing that the accounts earned interest and

producing statements that did not show interest. Tr., p. 243. Knowles testified:

> Q.    How did you produce that statement?
>
> A.    We produced it in the bank rather than
> through the computer system.
>
> Q.    Did you physically take a --
>
> [simultaneous conversation]
>
>               *    *    *
>
> A.    No, we took out a blank -- a blank statement
> form and then reproduced the figures without the
> interest. I used a word processing system.
>
> Q.    Just so I have it correct, the bank would get a
> statement through its regular processor showing the
> interest?
>
> A.    That's correct.
>
> Q.    What you would then do is you would prepare
> a completely separate statement that would be for
> that account, but would not show the interest?
>
> A.    That is correct.

Tr., pp. 243-44.

Colombo took an active role in and facilitated Greenbaum's

scheme to defraud MPA's creditors. It made unconventional loans. It

concealed the existence of those loans to auditors.  It generated dummy account statements to conceal that the deposit accounts were earning interest. These actions were necessary for the fraud scheme to succeed and establish actual fraudulent intent on the part of Colombo.  Mr. Knowles has admitted that he knowingly signed the false confirmations and created dummy account statements.

The fraud could not have been committed without the participation of Colombo.  Greenbaum enlisted the assistance of Colombo because he had formerly served as a director on its board and had connections. Op., p. 12; Tr., pp. 236-37.  The chairman of Colombo, who was Greenbaum's friend, was aware of the loans.  Tr., p. 239.

Even without Greenbaum's and Knowles' admissions of fraud, under Maryland law, the Trustee can establish fraudulent intent through the existence of indicia of fraud.  Among the generally recognized indicia of fraud are: 1. the insolvency of the transferor; 2. lack of consideration for the conveyance; 3. relationship between the transferor and transferee; 4. secrecy or concealment; and 5. departure from the usual method of business.  *Berger v. Hi-Gear Tire and Auto Supply*, 257 Md. 470, 263 A.2d 507, 510 (1970).  See also, *Watson v. Watson*, 73 Md. App. 483, 534 A.2d 1365 (1988).  The respective indicia of fraud were established as follows: the Trustee testified that MPA was insolvent; MPA received no consideration for the conveyance as the payments were to cover up Greenbaum's theft; Greenbaum was a former director of

Colombo; the true nature of the Share Loans was concealed through the false account confirmations and dummy account statements; and the Share Loans departed from the usual method of business as Knowles testified that no one had ever requested, or has since requested, similar loans.

All of this evidence supports the Bankruptcy Court's finding that Colombo knew or should have known of the fraud being committed in their bank. Op., pp. 12-13. Moreover, the bank's role was as an active participant in Greenbaum's scheme. Knowles knew what he was doing was wrong, but did it anyway, involving Colombo more deeply in the fraud with each step he took. By the end of the scheme he was lying to accountants and forging account statements by hand to replace the originals. Tr., pp. 243-44. The fact that Colombo sued Knowles for negligence regarding Greenbaum and the Share Loan scheme precludes Colombo from now arguing that Knowles, and thereby Colombo, did not facilitate the fraud. Tr., pp. 300-03. The lawsuit by Colombo against Knowles is an admission that Knowles knew or should have known of the fraud and done something to prevent Colombo's role in it.

### b. The Share Loan scheme caused damage to MPA.

The effect of the Share Loan scheme was to prevent the discovery of Greenbaum's fraud and allow it to continue for years. P. 7, Plea Agreement; Op., p. 12. In so doing, the funds stolen from MPA and its creditors mounted as Greenbaum was allowed to continue siphoning off MPA's money for his own use. Moreover, because the look-back period for the Trustee to avoid

fraudulent conveyances is only three years prior to bankruptcy, certain transfers occurring during the period where the Share Loan scheme operated became unrecoverable by the Trustee due to the statute of limitations and thereby damaged the estate.  (One example of these unrecoverable transfers is MPA's guaranty of the Sarubin Loan in 1994. D. 35, Guaranty.)  The Trustee is entitled to recover payments made in furtherance of the Share Loan scheme because they were fraudulent conveyances.

### c.  MPA payments made on Greenbaum's personal obligations.

The heart of Greenbaum's fraud scheme was to use MPA funds to pay his personal obligations.  P. 7, Plea Agreement; Tr., pp. 54-55; Op., p. 12. MPA received no consideration for these payments because the obligations were personal obligations of Greenbaum.  Tr., pp. 54-55.  Colombo concedes that MPA was paying Greenbaum's personal obligations.  Colombo's Brief at p. 6.

Greenbaum used MPA checks totaling $20,220.32 to pay a personal loan secured by a second deed of trust on his home in Columbia, Maryland.  P. 1, Checks; P. 2, Checks and payment information.  He also used MPA checks totaling $19,394.33 to pay a personal loan secured by a condominium in Ocean City, Maryland.  *Id.*  The loan secured by the second deed of trust on Greenbaum's Columbia residence was made to Greenbaum personally and the Loan Request Memorandum in Colombo's file stated that

the purpose of the loan was for "personal investment purposes." P. 2, Checks and payment information; P. 29, Loan Request Memo; Tr., pp. 259-62. Likewise, the loan secured by the Ocean City condominium was a loan to Greenbaum personally. Tr., pp. 173.

MPA could not have received any consideration for its payment to Colombo for these personal loans to Greenbaum. The only evidence offered to refute that the loan payments were improper was the testimony of Greenbaum, the convicted felon. Greenbaum testified that the payments on the loans were part of his salary from MPA. Tr., at pp. 155-57. Greenbaum's testimony is in direct conflict with his plea agreement, wherein Greenbaum admitted to skimming money to which he was not entitled from the HUD projects. P. 7, Plea Agreement, p. 4. The Trustee also testified that MPA's expenditures to Greenbaum's benefit exceeded the amount he declared as income. Tr., pp. 70-72. The Court admitted into evidence a chart prepared by the Trustee that summarized MPA's disbursements to the benefit of Greenbaum in excess of his recognized income. P. 38, Chart Summarizing Greenbaum income/disbursements. The Bankruptcy Court was in the best position to evaluate the credibility of the witnesses and properly chose to believe the plea agreement and the testimony of the Trustee and did not believe Greenbaum's explanation as it awarded damages to the Trustee for the amounts paid on account of those loans. Op., p. 13.

The payments on the second deed of trust loan and condominium loan also satisfy at least four of the indicia of fraud. They were made by an insolvent entity, for no consideration or benefit to MPA, Greenbaum had a connection to Colombo as a former director and there was a departure from the usual method of doing business in that a corporation was paying the personal debts of one of its officers. *Berger v. Hi-Gear Tire and Auto Supply*, 257 Md. 470, 263 A.2d 507, 510 (1970). See also, *Watson v. Watson*, 73 Md. App. 483, 534 A.2d 1365 (1988). Proof of *just one of the indicia of fraud* -- lack of consideration of a corporation's payment of the expenses of another entity -- is sufficient to prove fraud when coupled with the fraudulent intent of the officer of the corporation. *Colandrea v. Colandrea*, 42 Md. App. 421, 401 A.2d 480, *cert. denied* 286 Md. 745 (1979).

Moreover, because Colombo already knew that Greenbaum was making unconventional transactions with the assistance of Colombo's president and concealing information from HUD and MPA's creditors in the Share Loan scheme, Colombo had sufficient information to be put on inquiry and charged with intentional fraud for the non-Share Loan transfers. *Fick v. Perpetual Title*, 115 Md. App. 524, 694 A.2d 138, *cert. denied* 347 Md. 153, 699 A.2d 1168 (1997). At the very least, Colombo should have questioned that the corporate entity making the payments, MPA, did not match the individual obligor on the loans, Greenbaum. The Bankruptcy Court thus properly found

that these transfers were made with the intent to defraud creditors, and that

Colombo knew or should have known of the fraud.

### d. MPA transfers to Colombo for unexplained purposes

The Bankruptcy Court found, as the Trustee alleged, that there

were two transfers totaling $128,729.06, for which Colombo provided no

explanation.  Op., pp. 4-5.  One of the payments was check number 1254 dated

February 19, 1997 in the amount of $9,692.94.  P. 1, Checks; P. 2, Checks and

payment information.  There was no evidence presented at trial as to how this

check was applied.  In the statement of facts included in its brief, Colombo

seems to be asserting that this check was in payment of either the Ocean City

condominium or second deed of trust loan by including an additional $9,692.94

in its description of payments on those loans, but does not cite to any

testimony or documentary evidence in support of this "fact."  Colombo's brief,

p. 10.  Because there was no evidence that this check was applied to either the

condo loan or deed of trust loan, Colombo's implication that there was such

evidence is unsupported and misleading.

The second unexplained payment was the May 22, 1995 check

number 784 to Colombo in the amount of $172,000.00.  P. 1, Checks; P. 2,

Checks and payment information.  At trial, Colombo referred to documentary

evidence that $52,963.88 of the $172,000 was applied to a loan that was

guaranteed by MPA.  D. 22, identified, but not admitted.  There was no

documentary evidence as to how the balance, $119,036.22, was applied.  Mr.

Lane testified that the balance was applied to Share Loans and interest, but

under examination by counsel for the Trustee he was unable to explain his

testimony or point to any documentary evidence that supported his statement.

Tr., pp. 322-23 (examination by Colombo), 334-36 (examination by the

Trustee).

Mr. Lane's testimony was the only evidence of any kind

regarding what Colombo did with the $119,036.22 portion of the May 22, 1995

check.  The best evaluator of credibility of a witness's testimony is the trier of

fact, in this case, the Bankruptcy Judge.  Judge Schneider clearly did not

believe Mr. Lane and noted in his opinion that the only explanation offered at

trial was testimony (of Mr. Lane) that was unsupported by documentary

evidence.  Op., p. 4.  Judge Schneider drew a negative inference from the

testimony and awarded the Trustee the full amount of his claimed damages.

Op., pp. 4-5, 12-13.  The Bankruptcy Court's opinion notes that checks totaling

$128,729.06 were unexplained, making clear that the Court believed that no

credible explanation was offered for these two checks.  Op., pp. 4-5, 12-13.

Because no credible explanation for these checks was offered by

Colombo, the Bankruptcy Court properly concluded that they were fraudulent

conveyances.

### e. Amendment of the pleadings at trial, if necessary.

The evidence regarding check number 784, dated May 22, 1995 and in the amount of $172,000.00, raised an issue at trial.  Until receiving Colombo's pretrial statement, the Trustee believed that a $100,000.00 portion of check number 784 was in payment of a loan guaranteed by MPA.[4]  During discovery, the Trustee sought from Colombo production of all documents related to the transfers identified in the Complaint, including check number 784.  The parties continued to exchange documents until just prior to trial, but no explanation regarding the $172,000.00 was produced by Colombo.  Because the information in the pretrial statement indicated that Colombo could only explain a smaller portion of the check, $52,963.88, the Trustee noted in his opening statement that, depending upon the evidence adduced at trial, he would be seeking recovery of the larger, unexplained amount of $119,036.22.  Tr., pp.10-11.

Colombo was able to present documentary evidence at trial only as to $52,963.88 being applied to the loan guaranteed by MPA.  D. 22, identified, but not admitted.  The only evidence presented at trial by Colombo regarding the balance, $119,036.22, was the testimony from Mr. Lane that was

---

[4] The guaranty, dated August 23, 1994, was admitted as Colombo's Ex. 35.  The Trustee was precluded from seeking avoidance of the $52,963.88 portion of the payment because the guaranty fell without the three-year look-back period of the MFCA and was thereby barred by limitations.

unsupported by documents and flatly rejected by Judge Schneider as not credible.  Op., p. 4.

Because Colombo was unable at trial to explain how it applied the $119,036.22 portion of the check, the Trustee asserted at the close of the case that he was indeed seeking recovery of $119,036.22, inasmuch as the evidence presented at trial showed this amount of the transfer to be unexplained.  Tr., pp. 343-45.  The Bankruptcy Court considered that the Complaint sought to avoid the entire transfer of $172,000.00 as fraudulent, even though it gave Colombo credit for $100,000.00, based upon the evidence available to the Trustee at the time the Complaint was filed.  As such, the Bankruptcy Court determined that an amendment to the Complaint was not necessary and allowed the Trustee to recover the full $119,036.22 unexplained portion of the payment.

Even if an amendment to the Complaint was necessary, Fed. R. Civ. P. 15(b) allows pleadings to be conformed to the evidence at trial.  There is no doubt that the evidence at trial explained only $52,963.88 of the $172,000.00 check (noting that Colombo's Ex. 22 was never offered for admission into evidence).  Judge Schneider did not believe Colombo's explanation as to the remainder.  As such, the Trustee was entitled to, and the Bankruptcy Court awarded, recovery of $119,036.22 of the $172,000.00 check.

Colombo was not prejudiced by this ruling.  They were on notice as of the filing of the Complaint that the Trustee was seeking avoidance of the

transfer, identified by check number, date and amount. A copy of check number 784 was produced by the Trustee during discovery. When Colombo discovered that its own records only explained $52,963.88 of the check, it should have continued to search for an explanation. Its failure to do so bars it from complaining of prejudice.[5]

### f. Colombo did not "return" any money to MPA.

Colombo has asserted in Section IV of its brief that it should be given credit for funds wired from depository accounts of the partnerships that owned those accounts. In making this argument, Colombo describes the transactions for which it asserts it should be given credit: "It is undisputed on the record that over $335,000 was returned to the debtor when Share Loans were repaid in May of 1995 and July of 1997." Colombo's Brief at p. 26. This statement is blatantly incorrect and misleading to this Court. There is little, if any, evidence in the record to support Colombo's assertion, and to the extent there is any evidence, the Trustee disputes its relevance.

MPA transferred $238,751.61 of its funds to Colombo on July 14, 1997 by check number 1359. P. 1, Checks. The check was applied by Colombo to pay off five Share Loans in the names of Uplands A Limited Partnership,

---

[5] In addition to the fact that the Trustee had requested evidence regarding the transfer during discovery, he again raised the issue during opening statements on Day 1 of the trial. Mr. Lane, the witness that would have addressed the issue, did not conclude his testimony until Day 3. He had two nights to search Colombo's records for evidence of the application of the $172,000 check (which he should have already done in response to discovery). If the evidence existed, it is assumed he would have produced it at or before trial.

Uplands B Limited Partnership and Freedom Associates Limited Partnership totaling $235,000.00 plus interest. P. 10, Loan Statements. At that moment in time, the Share Loans had been paid off and all that remained at Colombo were the deposit accounts of Uplands Associates A, Uplands Associates B and Freedom Associates. The money in these accounts belonged to the owners of the accounts, and not to Colombo or to MPA. MPA had transferred its money to Colombo in payment of the fraudulent Share Loans and received nothing in return. Colombo never paid any money to MPA in consideration of the Share Loans.

There are both procedural and factual reasons why Colombo did not "return" any funds to MPA as Colombo argues. First, as a procedural matter, the only evidence that pertained to funds transferred to MPA or its creditors was not admitted into evidence.[6] During the testimony of Mr. Lane, Colombo identified Defendant's Exhibits 23-32 which were included in the trial exhibits as evidence of bank wires. Tr., pp. 308-12. Colombo never moved the admission of these exhibits into evidence and they are not part of the record on appeal. Tr., pp. 308-12. There was some indication in the transcript that an unknown participant stated that the exhibits were "already in." Tr., p. 312. There is no indication, however, that Colombo ever moved for their admission

---

[6] The Trustee notes that Colombo does not cite to the transcript or any exhibits in making its statements that $335,000 was repaid to the Trustee. The Trustee assumes, without admitting, that Colombo is referring to its Exhibits 23-32.

or that the Court ever admitted them and therefore, they cannot have been admitted.

Notwithstanding the procedural problem that Colombo faces in that there is no admitted evidence of any "repayment," the identified but not admitted exhibits do not support Colombo's assertions.  Assuming for the sake of argument that the exhibits are some evidence of a single wire transfer on October 28, 1997 and seven more wire transfers between November 17-28, 1997, totaling $235,000.00,[7] the critical fact remains that ***these wires are not payments by Colombo to MPA***.  These wires, as can be seen on the exhibits themselves (if they were admitted into evidence) are wires from the accounts of Uplands A, Uplands B and Freedom Associates.  ***These funds were not Colombo's money.***  Funds held by a bank in a depository account do not belong to the bank.  They belong to the entity that owns the account, in this case, Uplands A, Uplands B and Freedom Associates.  Colombo cannot receive credit, as it alleges, for payment of money that did not belong to it.

It is especially clear that the funds did not belong to Colombo when one considers that the Share Loans were paid off in July of 1997 and that the depository accounts sat untouched for months.  Tr., p. 329.  The wire transfers occurred four months or more after the Share Loans were paid off.  Tr., p. 329.  Colombo admitted in testimony that during that period from July

---

[7] Counsel for the Trustee stipulated to the total amount of the wires, but not that they were "wired back" to MPA.  Tr., p. 312.

through November, Uplands A, Uplands B and Freedom Associates were free to do whatever they wanted with the funds in those accounts because the customers owned them, not Colombo.  Tr., p. 329.

There is also a problem with the amount of funds for which Colombo is seeking credit.  Colombo is asserting that it should be given credit for $335,000.00 in "repayment," but Colombo's identified but not admitted exhibits 23-32 (and exhibit 33, which was neither identified nor admitted) only total $235,000.00.  Colombo cites to no documentary evidence, admitted or not, in support of the remaining $100,000.00 for which it claims it should receive credit.

Colombo is making this argument based on the testimony of Mr. Lane, described above, that was found incredible by Judge Schneider.  There is no credible evidence that any portion of the $172,000 check was made in payment of Share Loans.  Notwithstanding Mr. Lane's unbelievable testimony about the application of the payment, there was likewise no documentary evidence of additional wires made from deposit accounts held by Colombo.  The assertion that these wire transfers existed seems to have come from whole cloth.  Colombo's argument that it should be credited for monies returned on this transfer is legally incorrect and also without any evidentiary support whatsoever.

## 2.    Conveyances by insolvent entity without consideration

The District Court may apply the law and find for the Trustee on alternate grounds if there are sufficient facts in the record. *In re Royale Airlines*, 98 F.3d 852, 856 (5th Cir. 1996); *In re Stat-Tech Int'l Corp.*, 47 F.3d 1054, 1057 (10th Cir. 1995); *In re Andreuccetti*, 975 F.2d 413, 419 (7th Cir. 1992). As stated above, § 548 of the Bankruptcy Code and § 15-204 of the MFCA allow a Trustee to avoid and recover fraudulent conveyances if they are made while the transferor is insolvent and there is lack of adequate or fair consideration given to the transferor.

### a.  There is a presumption of insolvency under the MFCA.

In a fraudulent conveyance action brought under § 15-204 of the MFCA, there exists a presumption of insolvency. *Lacey v. Van Royen*, 259 Md. 80, 267 A.2d 91 (1970). The burden of proof is on the transferee to show that the debtor was solvent at the time of the transfers. *Id.* Colombo did not offer any evidence on the issue of solvency and therefore could not have rebutted the presumption of insolvency. Indeed, Colombo made no argument that MPA was solvent in either its opening or closing statements.

### b.  The Bankruptcy Court affirmatively found insolvency.

The Trustee was found to be qualified by the Bankruptcy Court as an expert in the area of insolvency. Tr., p. 41. The Trustee testified that

the fraud scheme of Greenbaum and Sarubin, by which they took money out of MPA to pay their personal obligations, caused MPA to become insolvent. Tr., p. 81. The Trustee also testified that MPA was insolvent at all times during the three-year period prior to MPA's bankruptcy. Tr., p. 79. The Trustee further testified in detail regarding his investigation of the books and records of MPA, how he came to determine that MPA was insolvent at all relevant times and the amounts by which MPA was insolvent. Tr., pp. 197-203.

Colombo objected to the testimony of the Trustee as an expert on the issue of insolvency, claiming that he was not properly disclosed. The scheduling order entered by the Bankruptcy Court in this case provided that experts were to be disclosed in the parties' pretrial statements. The Trustee complied with the scheduling order and he was properly disclosed as an expert in the pretrial statement. Moreover, Colombo's objection to the Trustee's testimony on insolvency, an issue upon which Colombo bore the burden of proof, is misplaced. Colombo cannot claim that they were unaware that the Trustee would testify on solvency when the burden of proof was Colombo's and it failed to produce a witness or evidence of solvency. Colombo was not prejudiced by the Trustee's testimony.

Finally, even if the Trustee had not been permitted to testify as an expert, he would still be allowed to testify as a percipient witness who investigated the books and records of MPA. Tr., pp. 42-43. He conducted this investigation of MPA pursuant to his duties as Trustee, which involve making

a determination of the assets and liabilities -- that is, the solvency or

insolvency -- of the debtor.  11 U.S.C. § 704.  Because the Trustee was under an

obligation to investigate the solvency of the debtor, he could have testified as a

fact witness regarding MPA's insolvency, even if he had not been qualified as

an expert.  Tr., pp. 42-43.

### c.  There was no consideration to MPA for the transfers to Colombo.

There is also sufficient evidence in the record for this Court to

find that there was no consideration to MPA for the payments it made to

Colombo.  The Bankruptcy Court noted in its opinion that there were four

categories of damages: payments made on Share Loans, payments made on

the Ocean City condo, payments made on the Columbia mortgage loan and

payments made for unexplained reasons.  Op., p. 4.  These four categories of

damages are broken down as follows:

| | *Damages Category* | *Amount of Damages* |
|---|---|---|
| *1.* | Share loans | $276,180.18 |
| *2.* | Payments on Ocean City condo 2-4-10 | $19,394.33 |
| *3.* | Payments on Columbia mortgage 2-24-149 | $20,220.32 |
| *4.* | Unexplained | $128,729.06 |
| *Total* | | *$444,523.89* |

In its opinion, the Bankruptcy Court specifically identified the amounts paid

to Colombo for unexplained reasons ($128,729.06) and the amounts paid on

the Share Loans ($276,180.18).  Op., pp. 4-5, 11.  The opinion did not

specifically identify the amounts attributable to the Ocean City condo and

Columbia mortgage loan, but it is clear that the Bankruptcy Court granted

the Trustee relief in the amount of $444,523.89 and, after deducting the

amounts listed for the Share Loans and unexplained payments, the remainder

is attributable to payments made on the Ocean City condo and Columbia

mortgage.

For the purposes of determining the bona fides of a given

transfer, Section 15-203 of the Maryland Fraudulent Conveyance Act defines

fair consideration as follows:

> Fair consideration is given for property or an
> obligation, if:
>
> (1)  In exchange for the property or obligation, as a
> fair equivalent for it and in good faith, property is
> conveyed or an antecedent debt is satisfied; or
>
> (2)  The property or obligation is received in good
> faith to secure a present advance or antecedent debt
> in an amount not disproportionately small as
> compared to the value of the property or obligation
> obtained.

There was no consideration to MPA for making any of the

transfers identified in the Complaint.  The $276,180.18 in Share Loan

payments were to effect a fraudulent scheme, hiding from HUD and MPA's

auditors that Greenbaum had skimmed money from MPA and its creditors.

Payments in furtherance of a fraudulent scheme of a third party cannot

constitute consideration to the transferor.  Likewise, there cannot be any

consideration for the $128,729.06 in payments made to Colombo for

unexplained reasons.  Because Colombo cannot explain how it applied the

payments, which the evidence showed were for the benefit of Greenbaum and not MPA, it necessarily stands that there was no consideration for the payments.

Finally, there was evidence submitted at trial by the Trustee that the payments made on the Ocean City condo and Columbia mortgage were obligations of Greenbaum personally and not MPA.  P. 1, Checks; P. 2, Checks and payment information; Tr., pp. 261-62.  Greenbaum received a benefit from these payments and MPA did not.  Colombo conceded that Greenbaum was improperly using corporate funds to pay his personal expenses.  Colombo's Brief, p. 5.  The only evidence offered by Colombo to refute the Trustee was the testimony of Greenbaum, that MPA's payments of his personal obligations were "salary."  Greenbaum's testimony is entitled to little credibility as a convicted felon, especially because the testimony conflicts with his plea agreement and the testimony of the Trustee.  Tr., pp. 70-72; P. 38, Chart of Greenbaum income/expenditures.

Payment of an antecedent debt of a third person is not fair consideration to the transferor.  *Berger v. Hi-Gear Tire & Auto*, 257 Md. 470, 476 (1970); *Lutherville Supply v. Dimon*, 232 Md. 195, 197-98 (1962).  Payment of Greenbaum's debts by MPA produced no benefit to MPA.  Moreover, the Court in *Berger* stated that it was "well-established" in Maryland that the "facts and circumstances may be such as to shift the burden to the grantee to establish the bona fides of the transaction."  Because of the dealings between

Greenbaum and Colombo throughout the Share Loan scheme, it would be

proper to shift the burden to Colombo to demonstrate that it gave fair

consideration to MPA in exchange for the mortgage payments. Colombo

cannot do so, and the Bankruptcy Court properly found that the Trustee may

thus avoid and recover the transfers as fraudulent conveyances.

### D.  Preferences Avoidable Pursuant to 11 U.S.C. § 547

According to § 547 of the Bankruptcy Code:

the Trustee may avoid any transfer of an interest of
the debtor in property-
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by
the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4)(A) made on or within 90 days before the date of
the filing of the petition;
(5) that enables such creditor to receive more than
such creditor would receive if-
(A) the case were a case under Chapter 7;
(B) the transfer had note been made, and;
(C) such creditor received payment of such
debt to the extent provided by the provisions
of [Title 11].

The Bankruptcy Court determined in its opinion that the three transfers made

in the 90 days prior to MPA's bankruptcy were preferential transfers and may

be recovered under § 547 of the Bankruptcy Code. Op., p. 5. Those transfers

were as follows:

| Check No. | Date | Amount |
|-----------|------|--------|
| 27678 | January 7, 1998 | $1,199.92 |
| 27925 | February 6, 1998 | $1,198.85 |
| 104 | March 11, 1998 | $1,198.85 |
| *Total* | | *$3,597.62* |

Appellant did not and could not raise any argument in its brief contradicting the Bankruptcy Court's findings and conclusion that these three payments were preferential transfers within the meaning of § 547 of the Bankruptcy Code.  The Trustee is entitled to the recovery of these transfers as preferential transfers as well.

## VI.  <u>CONCLUSION</u>

The Bankruptcy Court was in the best position to evaluate the credibility of the testimony and evidence before it.  Judge Schneider made that evaluation and found that Colombo was involved in a fraud scheme with Greenbaum, a convicted felon.  Colombo's appeal should be denied and the decision of the Bankruptcy Court affirmed.

<u>/s/ Charles M. Campisi</u>
John A. Roberts
Federal Bar No.  04969
Charles M. Campisi
Federal Bar No.  024119
Venable, Baetjer and Howard, LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400

Attorneys for Charles R. Goldstein,
Chapter 7 Trustee

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 17th day of March, 2003, a copy of the foregoing Appellee's Brief was served via electronic mail and the ECF system on Nelson Deckelbaum, Esquire and Stephen Nichols, Esquire, Deckelbaum, Ogens & Raftery, 3 Bethesda Metro Center, Suite 200, Bethesda, Maryland 20814.


<u>/s/ Charles M. Campisi</u>
Charles M. Campisi

## <u>Addendum of Statutes and Rule</u>

**11 U.S.C. § 550** states in pertinent part:

### Liability of transferee of avoided transfer

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, . . . 547, 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer. . . .

**11 U.S.C. § 704** states in pertinent part:

### Duties of trustee

The trustee shall-
  (1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of the parties in interest;

  (2) be accountable for all property received;

\*     \*     \*

  (4) investigate the financial affairs of the debtor;

\*     \*     \*

  (9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

**Fed. R. Civ. P. 15(b)** provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings

as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.  If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.  The court may grant a continuance to enable the objecting party to meet such evidence.