UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| COLOMBOBANK, F.S.B., : | |
| : | |
| Appellant, : | |
| : | |
| vs. : | Civil Action No. S02-4010 |
| : | |
| CHARLES GOLDSTEIN, Trustee : | |
| Of the Estate of Maryland Property : | |
| Associates, Inc., et al., : | |
| : | |
| Appellee. : | |
| : | |

**REPLY BRIEF OF APPELLANT COLOMBOBANK, F.S.B.**

Nelson Deckelbaum
Md. Fed. Bar No. 01249
Stephen Nichols
Md. Fed. Bar No. 08194
DECKELBAUM, OGENS & RAFTERY, CHTD.
3 Bethesda Metro Center
Suite 200
Bethesda, MD 20814
(301) 961-9200

Attorneys for ColomboBank, F.S.B.

The Appellant ColomboBank, F.S.B. (hereafter the "Bank") hereby submits its Reply Brief in response to the issues raised in the Brief of the Appellee (the "Brief"), Charles R. Goldstein, the Chapter 7 Trustee for the debtor Maryland Property Associates, Inc. (hereafter the "Trustee").

I.  The Bankruptcy Court's ruling allows the Trustee a double recovery which the Trustee ignores in his brief.

Although the Bank asserts a number of errors on the part of the Bankruptcy Court[1], the central theme of the Bank's appeal in this matter is that it must be given credit for the moneys it returned and released to the debtor or its creditors during the course of its relationship with Greenbaum, MPA and the related partnerships. The Trustee studiously avoids this fundamental theme in his Brief, choosing to ignore the financial reality of the various transactions and instead adopts a very broad approach that attempts to lump every transaction together under one giant fraudulent scheme, much as the Bankruptcy Court did. In so doing, the Bankruptcy Court and the Trustee ignore the facts and the law in this case and their responsibility to look at individual transactions.

No one disputes that Mr. Greenbaum committed a multitude of sins in connection with his operation of MPA and his misappropriation of the funds of the various properties for whom MPA acted as property manager. However, both the Bankruptcy Court in its Memorandum Opinion and the Trustee in his Brief fall into the same trap: they both take Greenbaum's admitted scheme and use its existence to taint individual transactions that in fact do not meet the legal requirements necessary for avoidance. As set forth more fully in the Bank's opening brief, the majority of the Bankruptcy Court's Order either gives the

---

[1] Capitalized terms herein have the same meaning ascribed to them in the Bank's initial brief.

estate a windfall, without giving the Bank credit for funds it actually returned for the benefit of the estate and its creditors, or lumps legitimate transfers into the Share Loan scheme without regard to whether or not the payments actually meet the requirements of a fraudulent conveyance. As set forth more fully below, the Trustee fails to squarely address the Bank's arguments, choosing instead to point loud and long at Greenbaum's fraud and hope that this court, like the Bankruptcy Court, allows Greenbaum's misconduct to taint its view of the actual transfers at issue here. The Court should resist the temptation to do so and reverse the Bankruptcy Court's erroneous ruling.

II.     The Bankruptcy Court's ruling regarding the Share Loan payments is plainly erroneous and the Trustee's argument regarding those payments is misguided.

MPA made two relatively large payments to the Bank to pay off Share Loans, the loans taken out by MPA in the names of various partnerships to hide the fact that Greenbaum was taking tenant security deposits and other funds from the partnerships.[2] *See generally*, Appellant's Brief, pp. 6-7. These payments were in the form of a July 14, 1997 check in the amount of $238,751.61 and a May 22, 1995 check, of which $100,000 was used to pay off share loan principal. The Bankruptcy Court incorrectly found that these payments were made with the actual intent to defraud and that the Bank knew or should have known of the fraud. The Trustee in his Brief does little more than mischaracterize both the facts and the law with respect to the Share Loan payments to try to support the Bankruptcy Court's erroneous ruling.

---

[2] / Rather than repeat the Share Loan story in detail here, the Bank respectfully directs the Court's attention to the description of the Share Loans set forth are described in detail at pages 6 and 7 of Appellant's Brief.

–3–

      A.      The July 14, 1997 Share Loan Payment is not a fraudulent conveyance under Maryland Commercial Law Code § 15-207 or otherwise subject to being set aside under any other law cited by the Bankruptcy Court or the Trustee.

As the Trustee concedes, the July 14, 1997 check in the amount of $238,751.61 from MPA was used to retire five of the Share Loans. Trustee's Brief, at pp. 37-38. The Trustee argues - as the Bankruptcy Court seemed to conclude in its Memorandum Opinion - that because the Share Loan scheme was fraudulent in its nature and effect, this payment must be fraudulent as well. However, both the Bankruptcy Court and the Trustee paint with too broad a brush. In order to be set aside as fraudulent, the Trustee must prove that the *transfer* itself – not just the overall scheme perpetrated by Greenbaum – was fraudulent pursuant to Maryland Commercial Law Code § 15-207.[3] Admittedly, the Bank's management – specifically, its president at the time, Thomas Knowles – made a number of errors in judgment in acceding to requests by Mr. Greenbaum in connection with the share loans.[4] Indeed, the Bank has sued Mr. Knowles for his negligence.[5]

---

[3] / Maryland Commercial Law Code § 15-207 provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud present or future creditors, is fraudulent as to both present and future creditors.

[4] / As set forth in greater detail at pages 15 through 22 of the Bank's opening brief, these errors in judgment are insufficient to support the Bankruptcy Court finding that The Bank was a participant in the fraudulent scheme.

[5] / The Trustee's argument that the Bank's action against Mr. Knowles for negligence "precludes" the Bank from arguing that it was not an active participant in Mr. Greenabum's fraud is hopelessly misguided. *See*, Appellee's Brief, page 29. The respective legal standards for fraud and negligence are plainly different. The Bank has obtained a judgment in excess of $211,000 against Mr. Knowles and proved in that case that Mr. Knowles had breached his duty of care to the Bank, his employer. This matter is Civil Matter No. 204946 in the Circuit Court for Montgomery County, Maryland Circuit Court. Judgment was entered in February of 2003, after the conclusion of the trial in the Bankruptcy Court in this case, and is therefore not part of the record in this case. This does not mean that the Bank participated in the fraud scheme, nor did the Bank allege any such thing in its suit against Mr. Knowles. To the contrary, Mr. Greenbaum's

However, the things that the Bank is alleged to have done – making the Share Loans in the first place, despite their unusual nature, signing, at Greenbaum's request, two of the numerous account confirmation forms that did not disclose that the funds in the Share Loan accounts were encumbered by liens held by the Bank and the preparation, at Greenbaum's request, of account statements that backed out the interest earned on those Share Loan accounts -  have nothing to do with the *transfer* of $238,751.31 to the Bank by MPA on July 14. 1997.  There is no testimony or other evidence to suggest that the Bank had anything to do with the decision to make this payment, the source of the funds for the payment or the timing of the payment.  To the contrary, Mr. Greenbaum expressly testified that *he*, not the Bank, authorized the July 1997 Payment of $238,751,61 with the intent of ending the Share Loan scheme once and for all:

> I wanted to get rid of all the share loans.  I wasn't under investigation or anything.  It was prior to that.  But I didn't want there to be anymore share loans.  It was enough.

Tr., p. 171.  There is no evidence that the Bank was involved in this decision.  It simply accepted the Payment from MPA, which was the authorized agent for the various partnerships that had acted as the borrowers on the Share Loans and in whose name the accounts were held, and thereafter released its collateral, the funds held in the respective Share Loan accounts.  Given Mr. Greenbaum's testimony, it is clear that the July 14, 1997 Payment was not fraudulent.  Moreover, even if Greenabum's intent was fraudulent, the Bank cannot be

---

testimony makes it clear that no one from the Bank either knew what he was doing or ratified his acts. Transcript, pp. 120-121.  Maryland law is clear that even if the grantor has a fraudulent intent, this will not vitiate or impair a conveyance unless the *grantee participates in the fraudulent intent*.  *Berger v. Hi-Gear Tire and Auto Supply, Inc.*, 257 Md. 470, 475, 263 A.2d 507, 510 (1970).

–5–

implicated with that same intent, since it had nothing to do with the decision to make the transfer.

The Trustee simply cannot have it both ways when it comes to Mr. Greenbaum's testimony. When it serves the Trustee's purposes, he relies extensively on Mr. Greenbaum's testimony. However, when the Bank relies upon uncontradicted testimony by Mr. Greenbaum, the Trustee expects the Court to discount that portion of his testimony as the words of a "convicted felon." The Trustee simply fails to come up with a plausible reason why Mr. Greenbaum would lie about the Bank's role – or more correctly, its lack of a role – in the fraud he perpetrated. Greenbaum's testimony is clear: the Bank was not involved in any way. Tr., pp. 119-120. Rather, Mr. Knowles was duped into taking the actions upon which the Trustee's claims are based.

As set forth more fully in the Bank's opening brief, the Fourth Circuit in *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 485 (4th Cir. 1992) has made it clear that in assessing transfers that might be set aside, courts should avoid application of the fraudulent conveyance and preference statutes in a way that would create a windfall for the estate. In response, the Trustee attempts to argue that the Share Loan scheme caused damage to the debtor. *See*, Trustee's Brief at pp. 29 – 30. However, the statutory structure requires the Trustee to prove that it was damaged by the specific *transfer* he seeks to set aside, not the Share Loan scheme in general.

The Trustee simply cannot show that the debtor was damaged or otherwise prejudiced by the July 14, 1997 Payment. As set forth more fully in the Bank's opening Brief at pages 22 through 24, the July 14, 1997 payment was made with funds MPA took

–6–

from the various partnerships it represented.[6]  This created an obligation from MPA to the partnerships, which were the primary creditors of the estate.  There is no dispute that after the July 14, 1997 Payment of $238,751.61, the money that was in the various Share Loan accounts – the Bank's collateral that secured the Share Loans - was returned.  This money was paid back to the various properties, which ultimately reduced the amount that MPA owed the properties.  Both the Trustee and the Bankruptcy Court ignore this financial reality.  The Trustee's reason for doing so is obvious; he wants to get the benefit of both the reduction in the estate's debt to the partnerships that the Bank's pay-out of the Share Loan accounts caused, plus a return of the Share Loan Payment itself, without which the Share Loan accounts never would have been released.  This is exactly the type of windfall the Fourth Circuit cautioned against in the *Bigelow Design Group* case.  It was error for the Bankruptcy Court to have ruled in this manner and incorrect for the Trustee to continue to argue this position in this appeal.

Moreover, while the Trustee argues that the money in the various Share Loan accounts was not MPA's property and could have been withdrawn by the partnerships at any time, the Trustee ignores the fact that the Bank had a lien on the funds in the Share Loan accounts and could have exercised its security interest against them if the Share Loans were not repaid.  There can be no serious dispute that the July 14, 1997 Payment in the amount of $238,751.61 resulted in the Bank releasing its security interest in the funds in the various accounts and those same funds thereafter being returned unencumbered to

---

[6] / The Trustee argues that because the partnerships' money, after it was misappropriated by the debtor, was placed in the debtor's operating account, it became the debtor's property.  Trustee's Brief, p. 9.  While this may be technically true, it ignores the fact that when the money was originally taken, it created a debt on the part of the debtor to the various partnerships and when the loans were paid off, the balances in the accounts were returned to the partnerships, thereby reducing the debt owed by the debtor to the partnerships.

the various partnerships.[7] This payment resulted in a reduction of the total debt owed by MPA to the partnerships as creditors. The Bank must receive credit for the return of these funds.

  B. The $100,000 portion of the May 22, 1995 payment was used to pay off Share Loans, is neither a fraudulent conveyance under Maryland Commercial Law Code § 15-207 nor otherwise subject to being set aside under any other law cited by the Bankruptcy Court or the Trustee.

Although the parties agree that the July 14, 1997 check was used to repay Share Loans, the situation regarding the May 22, 1995 check in the amount of $172,000 requires further explanation, in large part due to the manner in which the Trustee treated this check in his pleadings and at trial. In his complaint, the Trustee only sought to avoid $72,000 of this payment, apparently conceding that the remaining $100,000 was not subject to being set aside. However, as set forth in more detail in The Bank's opening brief at pp. 26 through 27, the Trustee changed his theory of recovery on the day of the trial, seeking recovery of $119,036.12 of the $172,000 May 22, 1995 check.

The evidence regarding these funds adduced at trial came from John Lane, who succeeded Mr. Knowles as the Bank's president. Mr. Lane testified that he had difficulty locating documentation regarding the allocation of the check, because he kept looking for a book entry in the amount that the Trustee had originally sought - $72,000. Tr., p. 290.

---

[7] / The record adduced at trial reflects that the Share Loan account proceeds were paid to the debtor and then distributed to the partnerships (*See*, Appellant's Brief at pp. 10-11, 21-22; Tr., p. 172). The Trustee in his Brief seems to argue that the money was paid to the partnerships directly (See, Appellee's Brief, pp. 37-39). However, the Trustee concedes at pp. 39 – 40 of his Brief that these funds were in fact returned to the various partnerships. As such, when the final accounting between the debtor and the partnerships was done by the partnerships for the purpose of determining their respective claims against the debtor, the estate received the benefit of the returned funds. Accordingly, whether the funds were returned to the partnerships through MPA or a related entity, as Mr. Greenbaum testified, or were paid directly to the creditor partnerships, as the Trustee appears to argue, the benefit to the estate is the same.

However, he was finally able to conclude that of the $172,000 paid to the Bank, $52,963.88 was applied to a loan made by the Bank to Morton Sarubin, which was guaranteed by the debtor (and which the Trustee conceded could not be avoided for that reason). He also concluded that the balance was used to retire principal and interest on Share Loans, *the $100,000.00 principal balance of which was later returned by the Bank in the same manner as was the case with the July 14, 1997 $238,751.61 Payment*. Tr., p. 290-291. Mr. Lane's testimony was uncontradicted, and was the only evidence adduced by either party regarding how the May 22, 1995 payment of $172,000.00 was applied and regarding the fact of the repayment by the Bank of $100,000.00 of this money. The Trustee claims that the Bankruptcy Court properly ignored Mr. Lane's testimony on this subject because it was not supported by any documentation and was not otherwise admissible. Trustee's Brief, p. 40. However, any deficiency in the documentary evidence offered on this fact is a function of how the Trustee litigated the case. As set forth more fully in its opening brief, the Bank was not prepared to offer documentary evidence on the return of $100,000.00 of the $172,000.00 Payment because the Trustee did not claim entitlement to these funds until the very morning of the trial. In fact, the Bank had previously spent a tremendous amount of effort trying to identify how the original claim - $72,000 – was applied. Tr., pp. 289-291. It was patently unfair for the Bankruptcy Court to permit the Trustee to change the theory of his case at the last minute and then to complain that the Bank had no documentary proof to show what happened to these funds. Had the Trustee timely advised the Bank of the actual amount he was claiming, then the Bank would have had an opportunity to examine its records to provide the evidence the Trustee now argues was missing.[8]

---

[8] Simple common sense also supports Mr. Lane's uncontradicted testimony that $100,000.00 of the

Moreover, if the Bankruptcy Court ignored Mr. Lane's testimony in its entirety, there is absolutely no evidence at all for the intent and purpose of the Payment. Without such evidence, it is difficult to see how the Bankruptcy Court could have found, as it did, that the $119,036.12 portion of the May 22, 1995 check was a transfer made with the actual intent to hinder, delay or defraud the debtor's creditors under Maryland Commercial Law Code § 15-207. In sum, the Trustee has failed to meet his burden on proving the debtor's intent and purpose with respect to this Payment.[9]

III.   The Trustee's arguments regarding the non-Share Loan
       payments to the Bank are not persuasive.

The existence of the final section of the Trustee's Brief is a tacit acknowledgment of the flimsiness of the grounds upon which the Bankruptcy Court actually based its Memorandum Opinion and Order. Here, the Trustee concludes by arguing that alternative grounds exist in the record for upholding the Order on appeal even if this Court decides, as it should, that the Bank did not accept the Payments with any actual intent to hinder, delay or defraud MPA's creditors. The Trustee argues that the record below could support a finding – not made by the Bankruptcy Court - that the Payments occurred while MPA was insolvent and were not based on fair consideration. Because of this, the Trustee argues, the Bankruptcy Court could have avoided the various transfers under Section 15-204 of the MCFA, which permits the avoidance of such transfers even in the absence of fraudulent intent on the part of a debtor's transferee.

---

$172,000.00 May, 1995 Payment was later returned, as was the case with the July, 1997 238,751.61 Payment. It would be passing strange for Greenbaum to have continued to use the Bank as his dupe in perpetrating his Share Loan scheme after May, 1995 – as he indisputably did - had the Bank in effect stolen this $100,000.00 from him as the Bankruptcy Court and the Trustee would appear to suggest.

[9] / Obviously, the Bank believes that Mr. Lane's testimony is credible and that it is the only evidence regarding the intent and purpose of the questioned portion of the May 22, 1995 payment. Accordingly, as a Share Loan payment, the Bank believes that this Payment should be afforded the same treatment it argues for regarding the July 14, 1997 Payment – that is to say, the Bank should be given a credit for the Share Loan account balances it returned upon receipt of the May 22, 1995 Share Loan Payment.

–10–

The Trustee's argument fails for at least two reasons. The first of these is the complete absence in the record below of any competent evidence that MPA was insolvent at the time of each of the Payments. The Trustee argues that this defect is not fatal to his case because the burden of proof to show solvency supposedly rests on the Bank. The Trustee misconstrues applicable Maryland case law. Maryland law does indeed provide that in certain circumstances a party defending an action under Section 15-204 has the burden to prove the solvency of the transferor. This is only the case, however, once the plaintiff has first established that the transfer in question was made without fair consideration. *In re Colandrea*, 17 B.R. 568, 579 (Bankr.D.Md. 1982). As shown below, the Trustee did not prove this.

Assuming that the burden of proving insolvency rested on the Trustee, it is clear that he fell woefully short of meeting that burden. The Trustee attempted to prove MPA's insolvency at trial through his own testimony as an expert.[10] *See*, Tr., at pp. 79-80. This was allowed by the Bankruptcy Court despite the fact that the Trustee never identified any expert in his Rule 26 disclosures, and failed to identify any experts in response to an interrogatory propounded to him in the discovery process that specifically asked that any experts be identified. The Bankruptcy Court nevertheless received the Trustee's opinion testimony over the Bank's objection[11], and in so doing committed reversible error. *Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 503 (D.Md. 1997) ("As a rule of thumb, if the failure to comply with the required disclosure involves a material aspect of the expert's testimony, and if the opposing party can show prejudice in connection with the lack of disclosure, then the opinion of the expert should be excluded, in whole or part,

---

[10]/ The Trustee is a certified public accountant. Tr., at p. 36.

[11]/ See, e.g,, Tr., pp. 37-39.

at trial.")  Because the only evidence of MPA's insolvency adduced at trial was erroneously entered into the record, the record is devoid of any grounds upon which this Court could now properly find for the Trustee under his alternative Section 15-204 theory.

Equally absent from the record is evidence that any of the Payments were not made for fair consideration.  All of the Payments were related to either the Share Loans, the Condominium Loan or to the Residential Loan.  Of the Bankruptcy Court's judgment for $444,523.99, $395,833.33 constituted repayments of Share Loan principal or payment of Share Loan interest.  The remaining $48,690.66 awarded by the Order was for the avoidance of Payments relating to either the Condominium Loan or the Residential Loan.  Each category of Payment was supported by adequate consideration.  With respect to the Share Loans, the undisputed evidence at trial was that Greenbaum had apparent authority to cause the Sarubin Partnerships to enter into the transactions, but had no actual authority to do so.  Because of this, the Sarubin Partnerships possessed claims against MPA for the unauthorized Loans which were expunged by the Share Loan Payments of $395,833.33.

Courts have long held that a payment is support by adequate consideration when it has the effect of extinguishing an indebtedness owed by the transferor to a third party:

> If the consideration given by the third party has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person *otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved…. In these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant*, for he has received, albeit indirectly, either an asset *or the discharge of a debt* worth approximately as much as the property he has given up or the obligation he has incurred.

*Rubin v. Manufacturers Hanover Trust*, 661 F.2d 979, 991-992 (2nd Cir. 1981) (emphasis added); *In re Lawrence Paperboard Coproration*, 76 B.R. 866, 874 (Bankr.D.Mass. 1987); *McNellis v. Raymond*, 287 F.Supp. 232, 239 (N.D.N.Y. 1968), *aff'd in part, rev'd in part on other grounds*, 420 F.2d 51 (2d Cir. 1970).

Similarly, Greenbaum testified at trial that MPA's payment of his obligations under the Residential Loan and Condominium Loan were part of his compensation package, in addition to his comparatively-meager $36,000.00 salary. This testimony was supported by his income tax returns, in which all of the Condominium Loan Payments and Residential Loan Payment were reported as income to Greenbaum. The Trustee did not attempt to rebut this testimony with anyone who purported to have a different understanding of Greenbaum's compensation package. Instead, his paltry "evidence" on this issue consisted solely of a chart compiled by the Trustee which purported to demonstrate that in each of the pertinent tax years Greenbaum received aggregate disbursements from MPA in excess of that reported as income on his individual tax returns. *See*, Exh. 38. However, this compilation has no probative value since it neither breaks down the disbursements to Greenbaum by category, nor does it detail the components of his reported income. Therefore, this compilation does not impact at all on the issue of whether the Residential Loan Payments or Condominium Loan Payments were part of Greenbaum's salary. At the very minimum, the question of whether the Condominium Loan Payments and Residential Loan Payments were properly supported by fair consideration – which the Bankruptcy Court did not purport to resolve with any fact finding – is not ripe for determination on appeal by this Court.

The Trustee's failure to prove that the Payments were not supported by consideration and his failure to prove MPA's insolvency by competent evidence together bar his attempt to remedy the Court's unsustainable actual fraud Judgment by resort to an alternative constructive fraud theory.

## **CONCLUSION**

The Bankruptcy Court's $444,523.99 judgment against the Bank should be reversed because it is based on an erroneous assumption that Maryland law permits the avoidance of a transfer on the basis of actual fraud when the transferee does not participate in the grantor's fraudulent intent.  It should also be reversed because the mere fact of Greenbaum's admittedly-fraudulent scheme does not establish – as the Bankruptcy Court seems to assume - that each transfer of money or property during the pendency of that scheme was made with a fraudulent purpose.

Even if the Bank had participated in Greenbaum's fraudulent scheme, it still would be entitled to a credit for the $335,000.00 in transfers that it subsequently returned to, or for the benefit of, MPA.  To do otherwise would be to flout the Fourth Circuit Court of Appeals' admonition against double recoveries in fraudulent conveyance litigation.

Finally, if this Court concludes, as it should, that there was no showing below of any fraudulent participation by the Bank in Greenbaum's scheme, the record below furnishes no basis upon which this Court could affirm the Bankruptcy Court's erroneous Order on the alternative theory that the Payments are avoidable on constructive fraud grounds.  This is because each and every penny of money transferred to the Bank by

MPA was supported by adequate consideration and, in any event, there was no competent evidence that MPA was insolvent during any of the pertinent time periods.

For all of these reasons, the Bankruptcy Court's Order should be reversed.

WHEREFORE, the Bank requests the entry of an order

    a. reversing the Bankruptcy Court's Order dated October 16, 2002;

    b. rendering judgment in its favor on each and every count of the Complaint; and

    c. granting it such other and further relief to which it is entitled.

Date: April 1, 2003.

                      Respectfully submitted,
                      DECKELBAUM OGENS & RAFTERY, CHTD.

                      By:    /s/ Stephen Nichols
                              Nelson Deckelbaum
                              Md. Fed. Bar No. 01249
                              Stephen Nichols
                              Md. Fed. Bar No. 08194
                              3 Bethesda Metro Center
                              Suite 200
                              Bethesda, MD 20814
                              (301) 961-9200

                      Attorneys for ColomboBank, F.S.B.

**CERTIFICATE OF SERVICE**

 I HEREBY CERTIFY that on this 2nd day of April, 2003 a copy of the foregoing Appellant's Reply Brief was mailed, via first class mail, postage prepaid, to the following:

John Roberts, Esq.
Venable, Baetjer & Howard, LLP
2 Hopkins Plaza
1800 Mercantile Bank & Trust Building
Baltimore, Maryland 21201
Counsel for Appellee

        /s/ Stephen Nichols
        Stephen Nichols